**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
TERRY GRAY,                   :    CIVIL ACTION NO. 09-3788 (MLC)
                              :
     Plaintiff,               :    MEMORANDUM OPINION
                              :
     v.                       :
                              :
R.J. REYNOLDS TOBACCO         :
COMPANY, et al.,              :
                              :
     Defendants.              :
_____:
```

**COOPER, District Judge**

Plaintiff, Terry Gray, commenced this action against defendants, R.J. Reynolds Tobacco Company ("R.J. Reynolds") and Carlos Morales ("Morales") (collectively, "Defendants"), alleging racial discrimination and retaliation in violation of 42 U.S.C. § ("Section") 1981 and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq. (Dkt. entry no. 9, Am. Compl.) Defendants move for summary judgment in their favor pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Dkt. entry no. 21.) Plaintiff opposes the motion. (Dkt. entry nos. 22, 23.)

The Court decides the motion on the papers without oral argument, pursuant to Rule 78(b). The Court, for the reasons stated herein, will grant the motion as to the Section 1981 claims. The Court will decline to exercise its jurisdiction with respect to the NJLAD claims, and will therefore dismiss those

claims without prejudice with leave to reinstate those claims in state court.

## BACKGROUND

### I.    Plaintiff's Employment at R.J. Reynolds

Plaintiff identifies himself as an African-American male. (Am. Compl. at ¶ 4.) He was employed by R.J. Reynolds as a sales representative, or "Territory Manager" ("TM") in the New Brunswick Division of R.J. Reynolds from 2005 until he left on short-term disability in March 2009; his employment formally terminated in October 2009. (Dkt. entry no. 21, Defs. Stmt. of Undisputed Material Facts ("Defs. Stmt.") at ¶¶ 4, 60-62, 68-76.) Plaintiff's responsibilities as a TM included calling on and servicing retail stores in the course of promoting R.J. Reynolds tobacco products, contracting with retailers for the merchandising of R.J. Reynolds products, and ensuring that the retail stores within his assigned territory had the proper representation and inventory levels of R.J. Reynolds products. (Id. at ¶¶ 5-6.)

Morales has been a Senior Division Manager ("DM") of the New Brunswick Division of R.J. Reynolds since January 2008. (Id. at ¶ 3.) Plaintiff, along with approximately eight other TMs, directly reported to Morales. DMs such as Morales are responsible for spending "Work With" days in the field with TMs for purposes of observation, oversight, training, and providing

2

feedback.  (Id. at ¶¶ 7-8.)  TMs receive written feedback in the
form of "Work With Reports" following each Work With day.  (Id.)
In addition to the Work With Reports, each TM's performance was
assessed annually.  (Id. at ¶ 10.)  This annual performance
evaluation assesses whether a TM met qualitative and quantitative
goals, and these goals are the same for all TMs in a given
division.  (Id. at ¶¶ 11-13.)

Morales's predecessor, Tim Gillespie, had issued Plaintiff
an Oral Warning on October 4, 2007, advising Plaintiff of several
areas of deficiency, including accuracy in reporting brand
distribution; accuracy in reporting store conditions; contract
discrepancies, requirements, and non-compliance; and failure to
follow management direction.  (Dkt. entry no. 21, Defs. Br. Supp.
Mot. for Summ. J. ("Defs. Br."), Ex. A-10, 10-4-07 Documentation
of Oral Warning.)[1]  Consistent with R.J. Reynolds policy,
Plaintiff was given a Development Plan for addressing these
deficiencies.  (Id., Ex. A-11, 10-4-07  Development Plan.)

When Morales became Plaintiff's DM in early January 2008, he
discussed the Oral Warning with Plaintiff in person.  In a
written report detailing Morales's first Work With day in the
field with Plaintiff, Morales states that he "spent the first
hour and a half discussing [the Oral Warning] with [Plaintiff]"

---

[1]  Plaintiff states, without any accompanying support, that the
Oral Warning was "inaccurate."  (Dkt. entry no. 23, Pl. Stmt. of
Undisputed Material Facts ("Pl. Stmt."), at ¶ 26.)

and that he "made sure that [Plaintiff] understood that . . . the Oral Warning still stands. . . . [Plaintiff] was very positive and receptive to our discussion." (Id., Ex. A-13, 1-11-08 Personal Performance Report.)  Plaintiff was not alone in this carryover of an Oral Warning from Gillespie to Morales's tenure. Gillespie had also issued an Oral Warning to another TM, Jon Emery, and Morales similarly issued a written report for Emery discussing the Oral Warning and noting that it still stood. (Id., Ex. C-3, 1-14-08 Personal Performance Report (noting that Emery had been issued an Oral Warning on 9-17-07 and stating that "Jon understood that . . . the Oral Warning still stands.")) Jon Emery is a Caucasian male. (Id., Ex. A, Pl. Dep. at 104:23-25.)

Morales issued a Written Reprimand to Plaintiff on April 3, 2008. (Id., Ex. A-14, 4-3-08 Written Reprimand.) The Written Reprimand was issued as the next corrective action following the Oral Warning with regard to Plaintiff's "failure to follow management instructions," e.g., failure to read corporate communications related to R.J. Reynolds promotional programs and initiatives and subsequently implement these programs and initiatives at the retail outlets assigned to Plaintiff. (Id.) Both Morales and Plaintiff signed the Written Reprimand. (Id.) Morales also issued Written Reprimands to two Caucasian TMs, Daylon Zimmerman and Art Lipson, for similar reasons around the

4

same time Plaintiff received his Written Reprimand.  (Id., Exs.
C-4 & C-5, Written Reprimands; Pl. Dep. at 105:1-4.)

Plaintiff wrote a letter to Morales, copying both Morales's
supervisor and the Sales Employment Practices Manager at R.J.
Reynolds headquarters in Winston-Salem, North Carolina,
disputing the bases for the Written Reprimand.  (Id., Ex. A-16,
4-7-08 Letter from Gray to Morales ("4-7-08 Letter").)  Plaintiff
brought up several issues he had with Morales, including:  (1)
his surprise that the Oral Warning was documented in Plaintiff's
performance review file, because Morales had suggested to him
that their working relationship would begin with a "clear . . .
slate"; (2) Morales's analysis of Plaintiff's assigned territory
forming the basis for the Written Reprimand occurred while
Plaintiff was on vacation, rather than during a Work With day;
and (3) Morales had denied reimbursement of a meal to Plaintiff,
and Plaintiff felt that the ensuing dispute "brought about the
written reprimand" because Plaintiff had suggested to Morales
that he would pursue the reimbursement issue with Morales's
supervisor if Morales did not approve the reimbursement.  (Id.)[2]
The 4-7-08 Letter concluded:  "I am deeply saddened by this

_____

[2]  Morales indicated that, in addition to Work With days, DMs are
responsible for periodically visiting stores assigned to TMs
without the TM being present; these visits are called "Work
Withouts" and are documented by the DM in "Work Without Reports."
(Defs. Br., Ex. C, Morales Decl. at ¶¶ 9-10.)  It does not appear
that the fact that Morales visited Plaintiff's assigned stores
without Plaintiff would have been unusual or improper.

5

Written Reprimand.  At this time, I feel as though I am walking on egg shells.  In view of all this, this may not be a healthy environment for me to perform my duties effectively." (<u>Id.</u>)  The parties agree that the 4-7-08 Letter contains no reference to or allegations of discrimination of any sort, including racial discrimination.  (Defs. Stmt. at ¶ 44; Pl. Stmt. at ¶ 44.)

A Work With Report pertaining to June 17, 2008, indicated that Plaintiff was not executing his basic job accountabilities, and Morales advised Plaintiff that he was failing to meet expectations.  (Defs. Br., Ex. A-20, 7-9-08 Work With Report.) Morales issued a Final Written Reprimand on July 9, 2008, documenting corrective action being taken against Plaintiff for failure to satisfactorily perform job accountabilities and failure to follow management instructions, including failure to comply with the Development Plans created for Plaintiff following prior corrective actions.  (<u>Id.</u>, Ex. A-22, 7-9-08 Final Written Reprimand.)  The Final Written Reprimand stated:  "You must immediately attain and sustain an acceptable level of performance in the areas noted. . . . Failure to do so will result in termination of your employment." (<u>Id.</u>)  Plaintiff refused to sign the Final Written Reprimand, "on protest." (<u>Id.</u>)  The Final Written Reprimand was accompanied by a revised Development Plan setting forth action plans for Plaintiff to attain satisfactory

job performance.  (Id., Ex. A-23, Email from Morales to Plaintiff
regarding July 2008 Development Plan.)

Plaintiff received an overall rating of "Fails to Meet
Expectations" in his 2008 Performance Assessment.  (Id., Ex. A-
29, Pl. 2008 Performance Assessment.)  While this assessment
contains specific examples of Plaintiff's quantitative and
qualitative shortcomings, based on sales data as well as
Morales's Work With Reports, Plaintiff contends that these
examples are based on "unfair and inaccurate Work Withs, . . .
Performance Evaluations . . . and Written Reprimands."  (Pl.
Stmt. at ¶ 55.)  He does not provide specific examples of alleged
inaccuracies, but appears to suggest that the bases for
Plaintiff's "Fails to Meet Expectations" rating were unfair in
that Morales was the only person evaluating him.

Plaintiff's "Fails to Meet Expectations" rating in the 2008
Performance Assessment resulted in his ineligibility for a year-
end bonus, in accordance with R.J. Reynolds policies.  (Defs.
Stmt. at ¶¶ 55-58; Pl. Dep. at 201:21-24.)  Plaintiff contends
that Defendants' denial of a year-end bonus was taken "[i]n
retaliation for plaintiff's informing HR about defendant's [sic]
Morales' abuse and hostility towards plaintiff," and alleges that
Caucasian male coworkers who were "similarly situated received
bonuses although their work was not up to par."  (Am. Compl. at ¶
28.)  The record indicates that one coworker, Daylon Zimmerman,

7

received a rating of "Almost Achieves Expectations" and another, Art Lipson, was rated "Achieves Expectations." (Dkt. entry no. 22, Pl. Br., Ex. B-11 & B-12, 2008 Performance Assessments for Daylon Zimmerman and Art Lipson.) Presumably, both of these employees were then eligible for year-end bonuses.[3] Plaintiff thus also proffers that these Caucasian employees received bonuses as evidence of racial discrimination. (Am. Compl. at ¶ 28.) However, the Performance Assessments indicate that both Zimmerman and Lipson came closer to achieving certain quantitative goals than did Plaintiff. (Pl. Br., Exs. B-11, B-12 & B-13.)

Plaintiff and Morales met in March 2009 to review Plaintiff's 2008 Performance Assessment. (Defs. Stmt. at ¶ 60.) Plaintiff became upset when he realized that he was not going to be receiving a bonus for 2008 and left work for the day. (Id. at ¶ 61; Pl. Dep. at 138:1-7, 148:2-5.) Plaintiff sought medical intervention for his high stress level and did not return to work after reviewing the 2008 Performance Assessment with Morales, going on short-term disability leave. (Defs. Stmt. at ¶¶ 61-62; Pl. Dep. at 148:6-19.) Pursuant to R.J. Reynolds's short-term disability policy, after Plaintiff had been on leave for four months Morales sent a so-called "four month-out notification

---

[3] Plaintiff testified at his deposition that he knew that Jon Emery, Art Lipson, and Daylon Zimmerman had received bonuses, because he talked to them about it. (Pl. Dep. at 200:22-201:10.)

8

letter" advising that Plaintiff had not informed R.J. Reynolds of an expected return date and that it would be filling his position, but that if he became able to return to work, R.J. Reynolds would try to find a comparable position for him. (Defs. Stmt. at ¶¶ 63-67; Defs. Br., Ex. A-30, 7-10-09 Letter from Morales to Gray.)

Plaintiff notified R.J. Reynolds that he was able to return to work in September 2009 and took three weeks of vacation, such that he intended to return to work in October 2009. (Pl. Stmt. at ¶ 68; Pl. Dep. at 160:5-22.) During the time Plaintiff was on vacation, personnel from R.J. Reynolds offered him a TM position in Lenox, Massachusetts, which was the geographically closest comparable position to Plaintiff's former position. (Defs. Br., Ex. D, Bailey Decl. at ¶¶ 4-10.) Plaintiff declined the position, and as a result, Plaintiff's employment with R.J. Reynolds was terminated, effective October 23, 2009. (Defs. Stmt. at ¶¶ 74, 76.)

## II. Complaints About Morales's Management Style

### A. Ethics Line Complaints and Investigation

Plaintiff, whose 4-7-08 Letter protested the Written Reprimand as unfair, was not alone in complaining to management about Morales. The R.J. Reynolds Ethics Line received anonymous complaints regarding Morales's management style in July and August of 2008. (Defs. Br., Ex. E, Garrison Decl. at ¶ 4; Pl.

9

Br., Ex. B-15, 10-22-08 R.J. Reynolds Report of Investigation of
Complaints Regarding Morales ("Investigation Report").)   As a
result of these complaints, Andrea Garrison, the Senior Manager
for Workplace Practices, interviewed five people who worked with
Morales, plus Morales, to investigate the complaints regarding
Morales's management style.   (Investigation Report at 1.)   These
interviews occurred between August 13, 2008, and August 25, 2008.
(Id. at 1-4.)   The interviewees included (1) Morales's
supervisor, Renee Duszynski, who observed that "Morales addresses
performance issues as needed and some of his [TMs] do not like
that"; (2) Plaintiff, who stated that "morale is very low and
that he cannot get along with [Morales] and that his peers feel
the same way about Morales," but made no mention of racial
discrimination; (3) Arthur Lipson, who reported that "Morales
does not act like a manager . . . if [Lipson] asks Morales a
question he gets reprimanded, causing him and his peers to be
afraid of asking questions," and that Morales's management style
was "negative, sarcastic, [and] condescending"; and (4) Kari
Roth, who advised that "people fear Morales and he does not treat
people right and that his management style is awful," she feels
harassed by Morales because he is "not organized at all and calls
her during her vacation and during sick days," that Morales
"takes pride in making his employees feel bad" and is
"disrespectful, negative, and never positive no matter what his

employees do, that he manages by fear, intimidates people, and
. . . has mistreated her co-workers [and] her," specifying Jon
Emery, Arthur Lipson, and Plaintiff as TMs who have been
mistreated by Morales.  (Investigation Report at 1-3.)  Jason
Cullen, a Caucasian male who had been a TM for four months at the
time of his interview, stated that he thought morale was good, he
was not afraid of asking Morales questions, and he enjoyed
working for Morales.  (Id. at 4.)

    **B.  Damiano Letter**

A Caucasian male TM, Matthew Damiano, wrote a resignation
letter in September 2008 to the R.J. Reynolds Human Resources
("HR") Department containing a litany of complaints about
Morales's management style.  (Defs. Br., Ex. A-39, 9-12-08
Damiano Letter ("Damiano Letter").)  The Damiano Letter
enumerated reasons why Damiano was leaving his employment as a
TM, including inadequate training, particularly in comparison to
training received by TMs in other divisions; excessive verbal
reprimands from Morales that were unfair in light of Morales's
failure to provide direction in the first instance, or because
the circumstance was out of Damiano's control; Damiano's need to
rely on other TMs instead of Morales for knowledge of how to do
the job; Morales's verbally criticizing Damiano in front of
clients; Morales's disorganization and unreasonable use of (or
lack of) communication; Morales's belitting of Damiano's hometown

11

of Pittsburgh, leading Damiano to feel "discriminated against as
to where [he] had come from"; and the "terrorization" of the
entire team of TMs in the New Brunswick Division by Morales.
(Id. at 1-5.)  Damiano characterized Morales as "a person with no
respect towards others" and likened him to a "driver of a blind
horse carrying an apple cart" who "has consistently whipped the
blind horse, yet the horse does not know which direction to go. .
. . [A]ll [Morales] knows what to do is whip, not hold the reigns
[sic] and direct the horse."  (Id.)

    Damiano's complaints about insufficient training were
apparently related to Morales's antipathy toward older, tenured
TMs:  "What time other managers spent with new employees,
[Morales] spent with group members Terry Grey [sic] and John
Emory [sic], who it seemed, [Morales] was intent on firing at the
time, and currently still does seem intent on.  While other
managers helped the new people, [Morales's] intent was getting
rid of the old."  (Id. at 2.)  As noted above, Jon Emery is a
Caucasian male and, along with Plaintiff, a person with whom
Morales discussed an Oral Warning issued by Morales's predecessor
as "still stand[ing]" when Morales became the DM for the New
Brunswick Division.

    C.  **Open Dialogue Meeting**

    The Ethics Line complaints and the August 2008 interviews
led the R.J. Reynolds HR Department to organize an Open Dialogue

meeting "to discuss the current working environment in the [New Brunswick] Division."  (Investigation Report at 5; Defs. Br., Ex. A-38, 10-1-08 Email from Ed Heller to New Brunswick Division Team.)  This meeting was held on October 1-2, 2008, and attended by all of the TMs who reported to Morales at that time, as well as members of the Workplace Practices group of the HR Department at R.J. Reynolds.  (Garrison Decl. at ¶¶ 3, 7-9.)  On the first day of the meeting, the TMs expressed their "common concerns, each of which were expressed by multiple TMs," including:  (1) low morale in the New Brunswick Division due to Morales's communication style, (2) Morales's tendency to contact TMs during their vacation and personal time, (3) a lack of clarity and timeliness in providing direction and feedback, and (4) a failure to provide "balanced," rather than just negative, feedback.  (Id. at ¶ 11.)  The TMs present included two African-American males, including Plaintiff, and six Caucasians, two of whom were women.  (Id. at ¶ 8; Defs. Stmt. at ¶ 86.)  The TMs collectively complained of a "hostile work environment" in that Morales "has authority issues," made them feel stupid for asking questions, was always looking for things that were wrong, and was cold and sarcastic.  (Investigation Report at 5-6.)  Neither Plaintiff nor any other TM suggested that Morales's conduct was racially motivated or otherwise complained of racial discrimination by Morales.  (Garrison Decl. at ¶ 13.) Morales attended the second

13

day of the meeting and "acknowledged the need to improve his management style."  (Id. at ¶ 14.)[4]

The Investigation Report concluded, after the Open Dialogue meeting, that many of the complaints about Morales were substantiated, including low morale due to ineffective management and communication style, Morales's tendency to contact TMs during vacation and personal time, a lack of clarity and timeliness in providing direction and feedback, and Morales's tendency to only

_____

[4]  Plaintiff testified at his deposition that during the Open Dialogue meeting, he showed Ed Heller of the Workplace Practices group "a complaint to the EEOC that [Plaintiff] filed against [Morales]."  (Pl. Br., Ex. A, Pl. Dep. at 185:8-13.)  However, Plaintiff also testified that he could not recall when he allegedly filed such complaint, nor does any documentation of an EEOC complaint exist in the record other than a letter addressed to Plaintiff and dated 8-25-08 from an EEOC investigator advising, "The EEOC has received your response to the questionnaire(s).  The analysis of your response to the questionnaire(s) has led to the following conclusion: . . . The information that you have submitted is not sufficient to establish the basis for filing a charge."  (Dkt. entry no. 26, Defs. Reply Br., Ex. G-5, 8-25-08 EEOC Letter.)
Defendants' counsel requested relevant records from the EEOC pertaining to any complaints Plaintiff may have filed, but the agency was unable to either grant or deny the request, "because the charging party in question never filed an official charge complaint with the . . . EEOC."  (Id., Ex. G-6, 8-4-10 Letter from EEOC to Defendants' Counsel (stating "No records fitting the description of the records you seek disclosed exist or could be located after a thorough search.").)  While Plaintiff's deposition testimony refers to a sense of collective agreement among the TMs that Morales "was, uhm, discriminating against individuals his hos[tile]--his abusive nature as regards to the letter that was sent by Matt [Damiano] which spelled out a lot of that," neither this testimony nor any other record evidence suggests that the issue of racial discrimination was raised at the Open Dialogue meeting or at any other time, contrary to Plaintiff's unsupported assertion that "Plaintiff's discussion with Ed Heller was particular to race." (Pl. Dep. at 186:5-15; Pl. Stmt. at ¶ 93.)

provide negative feedback rather than "balanced" feedback.
(Investigation Report at 8.)  However, Garrison determined that
the allegations that Morales created a hostile work environment
or harassed his employees in front of customers had not been
substantiated.  (Id.)  She further determined that there was no
basis to conclude that age discrimination had occurred in the
form of singling out Plaintiff and other longer-tenured employees
such as Emery, because the "investigation revealed that Morales'
'high' standards and negative feedback affected most of the
division, and not just the more tenured employees."  (Id.)  No
corrective action was taken against Morales following the Open
Dialogue meeting.  (Id.)

### D.   Plaintiff's Characterization of Discrimination and Work Environment

Plaintiff's description of why he believed his workplace was
a "racist environment" in that he "was being ridiculed" in the
form of Morales's "nitpick[ing]" are consistent with the
complaints brought against Morales in the Damiano Letter and by
the other TMs at the Open Dialogue meeting, and contains nothing
that would allow an inference that Plaintiff was treated any
differently than other TMs on account of his race.  (Pl. Dep. at
129:2-8.)  He stated:  "The harassment.  The hostile work
environment.  They way people talk to you.  I was treated worse
than a dog."  (Pl. Dep. at 129:8-10; see also Pl. Br., Ex. F, Pl.
Decl. at ¶ 19.)  Although he contends that "[n]o other TM

suffered what Morales did to me," the record is replete with references to other TMs feeling treated in the same bullying or nitpicking manner.  (Pl. Decl. at ¶ 23.)  Plaintiff testified that at the Open Dialogue meeting, the other TMs indicated that Morales "had raised [his] voice to them in private and in public," "w[oke] them up late hours of the night," and "call[ed] them on vacation."  (Pl. Dep. at 190:1-6; cf. Pl. Decl. at ¶¶ 21-23 (complaining that Morales objected to scheduled vacation days, constantly emailed him outside of business hours, and made unreasonable demands that Plaintiff do things within hours or minutes).)  His complaint that Morales "was on a rampage, attacking, humiliating, and discrediting my work at every turn" is consistent with Lipson and Roth's complaints about Morales's treatment of them and other TMs, as discussed in the Investigation Report, as well as the complaints voiced in the Damiano Letter.  (Pl. Decl. at ¶ 13; Investigation Report at 3-4; Damiano Letter at 4 ("I, as well as at least two of my group members, don't sleep the night before we work with [Morales] due to an absolute terror of what could possibly happen during the work with. . . . No one should have to go through this, and the New Brunswick division was terrorized at all times and in all ways by [Morales].").)

16

## III. Procedural History

Plaintiff filed the Complaint on July 29, 2009, while he was on short-term disability leave, and amended the Complaint on March 3, 2010, following the termination of his employment.  The Amended Complaint contains claims for intentional discrimination, hostile work environment, and retaliation, in violation of Section 1981 and the NJLAD, against R.J. Reynolds and Morales individually, for allegedly denying Plaintiff promotions and other professional advancement opportunities on the basis of his race, and denying Plaintiff equal terms and conditions of employment.  (Am. Compl. at 8-22.)  It also contains claims against Morales for aiding and abetting employment discrimination at R.J. Reynolds, in violation of N.J.S.A. § 10:5-12e, and against R.J. Reynolds for racially disparate impact, in violation of the NJLAD.  (Id. at 18-19, 9-10.)  Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1343, and 1367.  (Am. Compl. at ¶ 2.) The Court, at this juncture, considers only the federal claims arising under Section 1981.

### DISCUSSION

## I.   Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides that summary judgment is proper if there is no genuine issue as to any material fact and the movant is entitled to judgment as a

17

matter of law.  Fed.R.Civ.P. 56(a).  In making this
determination, the Court must "view[] the record in the light
most favorable to the non-moving party and draw[] all inferences
in that party's favor."  United States ex rel. Josenske v.
Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing
Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir.
2001)).

## II.  Section 1981 Standard

    Section 1981 "affords a federal remedy against
discrimination in private employment on the basis of race."
Johnson v. Ry. Express Auth., 421 U.S. 454, 460 (1975).  It
requires that all persons in the United States have "the full and
equal benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens, and shall
be subject to like punishment, pains, penalties, taxes, licenses,
and exactions of every kind, and to no other."  42 U.S.C. §
1981(a).

    Section 1981 provides a private cause of action for
intentional discrimination only.  Gen. Bldg. Contractors Assoc.
v. Pennsylvania, 458 U.S. 375, 391 (1982).  Where a plaintiff, as
here, does not present direct evidence of discrimination, a court
will apply a three-step, burden-shifting analysis established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See
Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 268-270 (3d Cir.

18

2010) (applying <u>McDonnell Douglas</u> framework to Section 1981
claims); <u>Langley v. Merck & Co.</u>, 186 Fed.Appx. 258, 259 (3d Cir.
2006).  We consider whether Plaintiff has made out a prima facie
case of discrimination under any theory and find that he has not.

**III. Analysis of Plaintiff's Claims**

    **A.   Intentional Discrimination Claim**

To establish a prima facie case of discrimination, a
plaintiff must show that (1) he is a member of a protected class,
(2) he satisfactorily performed the duties required by his
position, (3) he suffered an adverse employment action, and (4)
either similarly-situated non-members of the protected class were
treated more favorably, or the adverse job action occurred under
circumstances that give rise to an inference of discrimination.
<u>Langley</u>, 186 Fed.Appx. at 259; <u>see also</u> <u>McDonnell Douglas Corp.</u>,
411 U.S. at 802 & n.13 (noting that the facts necessary to
establish the prima facie case will vary for each case).  Upon
such prima facie showing, the burden shifts to the defendants to
articulate a legitimate, non-discriminatory reason for the
challenged action.  If the defendants do this, the burden shifts
back to the plaintiff to show that the proffered reason is
pretextual.  <u>See</u> <u>Flax v. Delaware</u>, 329 Fed.Appx. 360, 363-64 (3d
Cir. 2009).

The parties do not dispute that Plaintiff, an African-
American, is a member of a protected class, and therefore the

first element of the prima facie case is satisfied here.  The
Court will assume without finding, as to the third element, that
either the denial of a year-end bonus in 2008 or the termination
of Plaintiff's employment in 2009 could constitute an adverse
employment action, and we therefore do not further examine that
element.  However, Plaintiff fails to demonstrate the second and
fourth elements of his prima facie case of discrimination.

Regarding the second element, the record indicates that
Plaintiff did not satisfactorily perform the duties required by
his position.  His 2008 Performance Assessment indicates that
Plaintiff failed to meet both quantitative and qualitative goals
for the year.  Plaintiff suggests that he was somehow at a
disadvantage or discriminated against vis-a-vis coworkers in that
Morales alone inspected Plaintiff's stores and attended the Work
With days, whereas other TMs allegedly had the benefit of upper
management observing their stores or having a Work With day
attended by Morales's supervisor.  (See, e.g., Pl. Br. at 15.)
But Morales testified that although another manager might
sometimes work with one of the TMs Morales supervised, he had not
"had a situation where somebody went out and worked with one of
[his TMs] to do an evaluation."  (Pl. Br., Ex. B, Morales Dep. at
31:4-20.)  Morales further stated, "I'm the only person who's
supposed to be evaluating my people during the Work With."
(Morales Dep. at 31:7-9.)  The record does not indicate that any

of the TMs were formally evaluated by anyone other than Morales
for purposes of the year-end Performance Assessments.  For
instance, neither Zimmerman nor Lipson's 2008 Performance
Assessment contain comments from managers other than Morales or
indicate any bases for the evaluation than those referenced in
Plaintiff's 2008 Performance Assessment.  (Pl. Br., Exs. B-11, B-
12 & B-13.)  We find that the fact that upper management may have
accompanied Morales on some Work With days, but not to
Plaintiff's stores, is not material to the determination of the
current motion in light of Morales's undisputed testimony that
evaluations are done by him alone and not additional managers.
We observe that it is not for the Court "to second guess the
methods [Defendants] used to evaluate [their] employees." Taylor
v. Amcor Flexibles Inc., 669 F.Supp.2d 501, 508 (D.N.J. 2009)
(citing Walton v. Mental Health Ass'n of Se. Pa., No. 96-5682,
1997 WL 717053, at *8 (E.D. Pa. Nov. 17, 1997) ("[E]mployers are
entitled to make employment decisions which are unpopular,
unwise, and even unjust as long as they do not do so for
discriminatory reasons."), aff'd, 168 F.3d 661 (3d Cir. 1999));
see also Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d
509, 527-28 (3d Cir. 1992) (holding that district court erred by
considering wisdom of, and disagreeing with, standards used by
law firm in making partnership decisions, as opposed to whether
firm applied those standards equally to both men and women).

Plaintiff's performance problems predated the installation of Morales as the DM for the New Brunswick Division.  (See Documentation of Oral Warning.)  The Written Reprimand, Final Written Reprimand, and 2008 Performance Assessment further document Plaintiff's deficiencies.  Plaintiff's protestations that these documented instances of corrective action are somehow inaccurate or unfair lack any evidentiary support, and Plaintiff does not dispute the evidence in the record that similar actions were also taken against Caucasian employees.  See Mitchell v. Western Union, No. 06-949, 2007 WL 4440885, at *4-5 (D.N.J. Dec. 18, 2007) (granting summary judgment to employer where employer "offered evidence demonstrating that Plaintiff cannot prove that he was performing his job at a satisfactory level," and Caucasian employees had also received negative performance evaluations and were terminated when they failed to meet the goals of their improvement action plans).  We find that Plaintiff has not countered the evidence adduced by Defendants showing that Plaintiff failed to satisfactorily perform the duties required of him, and therefore has failed to make out the second element of a prima facie case of intentional discrimination.

Plaintiff has also not made out the fourth element of a prima facie case.  The record is not indicative of any circumstances from which one could draw an inference of racial discrimination; rather, it appears that Morales was an equal-

22

opportunity offender whose management style "terrorized" the entire New Brunswick Division, leading nearly all TMs managed by Morales, not just Plaintiff, to feel harassed or discriminated against.  (See Damiano Letter at 4 (stating he felt "discriminated against as to where [he] had come from"); id. at 2 (stating that Morales "seem[ed] intent on" firing both Plaintiff and Jon Emery, a Caucasian TM); Investigation Report at 3 (statements of Lipson and Roth that they have felt harassed by Morales); see generally Defs. Br. at 17-21 (demonstrating that each of Plaintiff's complaints about Morales were shared by other TMs who are not African-American).)[5]  Plaintiff has produced no evidence that would indicate that similarly situated non-members of the protected class, e.g., TMs who are not African-American, were treated more favorably, and his subjective belief that he was treated poorly because of his race will not suffice to overcome Defendants' motion for summary judgment.  See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003); Bailey v. Reading Hous. Auth., No. 04-2532, 2005 WL 1006265, at *3 (E.D. Pa. Apr. 29, 2005), aff'd, 187 Fed.Appx. 148 (3d Cir. 2006).

----

[5]  Plaintiff's references to Morales's allegedly unfair treatment of a Caucasian female R.J. Reynolds employee in 2007 as mirroring his own experiences with Morales, such as issuing "inaccurate Work With [Reports], negative performance assessment and then a Written Reprimand," undermine any supposed inference of racial discrimination insofar as it demonstrates that Morales treated African-Americans and Caucasians the same way.  (Pl. Br. at 5-7.) Additionally, "evidence of alleged gender discrimination is not relevant for proving a claim of racial discrimination."  Taylor, 669 F.Supp.2d at 510.

Accordingly, Plaintiff has failed to satisfy the fourth element of a prima facie case of intentional discrimination.

Plaintiff being unable to establish a prima facie case of intentional discrimination, we do not proceed to the second and third steps of the McDonnell Douglas burden-shifting analysis. The Court will enter judgment in favor of Defendants as to Plaintiff's claims of intentional discrimination in violation of Section 1981.

### B. Retaliation Claim

A prima facie case of retaliation requires a plaintiff to show that (1) he engaged in protected activity, (2) the employer took a "materially adverse" employment action, and (3) a causal connection exists between the employee's protected activity and the adverse employment action. See Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006). When the claimed "protected activity" is opposition to unlawful discrimination, a plaintiff must show that he had an objectively reasonable belief that the activity he opposed is unlawful. Wilkerson v. New Media Tech. Charter Sch., 522 F.3d 315, 322 (3d Cir. 2008).

Plaintiff has not shown that he engaged in protected activity. Plaintiff contends that he was retaliated against because he had "contrary opinions" to Morales and "objected to

the observations and remarks of Morales." (Pl. Br. at 8.)[6] He also alleges that "[t]he retaliatory hostile work environment would not have occurred but for [his] complaints submitted to Reynolds regarding racism." (Am. Compl. at ¶ 84.) However, no evidence in the record indicates that Plaintiff actually complained to anyone at R.J. Reynolds about racism or racial discrimination. See supra at 14 n.4. The only evidence in the record of a complaint made by Plaintiff regarding Morales is the 4-7-08 Letter, which contains no reference to racial discrimination but rather has general complaints of unfair treatment. General complaints of unfair treatment do not constitute "protected activity." Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995); see also Flax, 329 Fed.Appx. at 364 (holding that grievance filed by plaintiff containing no mention of racial discrimination did not constitute protected activity for purposes of retaliation claim).

---

[6] Plaintiff again raises the issue of TMs other than himself having the opportunity to work with upper-level managers other than Morales as an alleged manifestation of Morales's alleged retaliation for Plaintiff's complaints about Morales's management style. As noted above, the fact is not material in light of Morales's testimony that he alone evaluates the TMs reporting to him, regardless of whether another manager accompanies them on a Work With day. See supra at 20-21. Moreover, Plaintiff argues that "On September 15, 2008 Work With Rep Report (attached as A-14) Morales worked with Renee Duszynski to review Jennifer Allen and Art Lipson stores [sic]." (Pl. Br. at 8; but see Pl. Br., Ex. B-14, "Manager Work Without Report" dated 10-15-08 (emphases added).) The Work Without Report relates to Art Lipson only and contains no reference to the presence, absence, or any contribution by Renee Duszynski.

Plaintiff testified at his deposition that the 4-7-08 Letter was the only time he complained about Morales before he participated in the Open Dialogue meeting.  (Pl. Dep. at 191:22-193:5.)  Because Plaintiff has not shown that he engaged in protected activity, he has failed to establish a prima facie case for retaliation.  Judgment will be entered in favor of Defendants as to Plaintiff's claims of retaliation in violation of Section 1981.

### C. Failure to Promote Claim

A prima facie case for failure to promote or denial of job opportunities requires a plaintiff to "show that the employer denied him the promotion and awarded it to someone else." Sampath v. Concurrent Techs. Corp., 299 Fed.Appx. 143, 145 n.3 (3d Cir. 2008) (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).  Plaintiff here has made no such allegations, and offered no evidence in support of his bald contention that the alleged discrimination took the form of "denying [Plaintiff] promotions and other professional/career advancement on the basis of [his] race and/or ethnicity."  (Am. Compl. at ¶ 43.)  The record contains references to Plaintiff informing Morales that he would like to be promoted in the future, but there is no evidence that a promotion became available, that Plaintiff applied for it,

or that it was given to someone else.[7]  Accordingly, to the
extent the Amended Complaint asserts a failure to promote claim
under Section 1981, judgment will be entered in favor of
Defendants.

    **D.  Hostile Work Environment Claim**

    To assert a prima facie case of hostile work environment,
plaintiff must show that (1) he suffered intentional
discrimination because of his race, (2) the discrimination was
severe or pervasive, (3) the discrimination detrimentally
affected him, (4) the discrimination would detrimentally affect a
reasonable person in like circumstances, and (5) the basis for
employer liability is present.  <u>Jensen v. Potter</u>, 435 F.3d 444,
449 (3d Cir. 2006) (citations and footnotes omitted), <u>overruled
in part on other grounds by</u> <u>Burlington N. & Santa Fe Ry. Co. v.
White</u>, 548 U.S. 53 (2006); <u>see also</u> <u>Tucker v. Merck & Co.</u>, 131
Fed.Appx. 852, 858 (3d Cir. 2005) (applying standard to a Section
1981 hostile work environment claim).  As discussed above,

_____

[7]  The "failure to promote" aspect of the Amended Complaint
apparently derives from Plaintiff's concern that a putative
promotion would not be available to him due to the corrective
actions taken against him by Morales, rather than any discrete
act of applying for a promotion to an available position.  (See
Pl. Br., Ex. B-5, Notes from Interview with Morales during Ethics
Line investigation (stating that the only instance of a direct
report bringing a concern to Morales's attention was during
Plaintiff's mid-year review, when Plaintiff "said he wants to get
promoted and he doesn't understand why he has been written up
twice, but we talked about it and he understood."); Defs. Reply
Br., Ex. G-3, 7-20-08 Emails between Morales and Duszynski
(regarding Plaintiff's desire to advance within the company).)

Plaintiff fails on the first prong here, as the record contains no evidence whatsoever that Plaintiff suffered intentional discrimination <u>because of his race</u>.  Accordingly, to the extent the Amended Complaint asserts a claim for hostile work environment under Section 1981, judgment will be entered in favor of Defendants.

### CONCLUSION

For the reasons stated <u>supra</u>, the Court will grant the motion to the extent that Defendants seek summary judgment in their favor as to the Section 1981 claims.  Having disposed of the Section 1981 claims, the Court need not address the state law claims, and will dismiss the state law claims without prejudice to reinstate in state court.  <u>See</u> 28 U.S.C. § 1367(c)(3), (d).  The Court will issue an appropriate Order and Judgment.


    s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated:    January 13, 2011

28